NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0331n.06

Case No. 21-1717

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Aug 12, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| CAN IV PACKARD SQUARE, LLC, | ) | |
| Plaintiff-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| CRAIG SCHUBINER, | ) ) | |
| Defendant-Appellant. | ) ) | OPINION |
|  | ) | |

Before: GIBBONS, WHITE, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. A quick drive south from the University of Michigan sits an apartment-retail complex formerly known as *Packard Square.* Construction for the development finished in 2019 after going more than $20 million over budget. Disputes over financing for the development are the genesis of this appeal.

Can IV Packard Square, LLC ("Can IV") financed the project by loaning tens of millions of dollars to the developer, Packard Square, LLC ("Packard Square"). It secured that loan with a mortgage on the property. In addition, Packard Square's sole member Craig Schubiner executed a guaranty to cover completion costs above and beyond the original budget. Can IV ended up foreclosing on the property and recouped the guaranty amount from the sheriff's sale and a state-court judgment. But Can IV sued to enforce the guaranty anyway, and the district court awarded $20 million plus 16 percent interest. Because this amounts to impermissible double recovery, we vacate, reverse, and remand with instructions to enter summary judgment in Schubiner's favor.

I.

The law in this case is simple but the facts are complex. We begin with the facts and procedural history. Back in 2014, Packard Square set out to redevelop a derelict shopping center into a luxury retail and apartment complex. To finance the project, Packard Square obtained a $53.78 million loan (the "Original Loan") from Can IV, a private equity firm. The parties executed a loan agreement (the "Original Loan Agreement"). And they secured that loan with both a mortgage on the property and a promissory note (together with the Original Loan Agreement, the "Original Loan Documents"). Under the mortgage, Packard Square consented to "the appointment of a receiver for all or any part of the Property" in the event of default. (R.1, Mortg., PageID 119.)

Can IV wanted additional assurances, so Packard Square's principal and sole member—Craig Schubiner—executed two guaranties to belt-and-suspender Can IV's investment. The first of these (the "Recourse Guaranty") guaranteed repayment of the Original Loan. And the second (the "Completion Guaranty") guaranteed both the completion of the project "within the time limits set forth in the [Original] Loan Documents" and payment of any "Completion Cost Deficiency." (R. 130-3, Completion Guar., PageID 8626-41.) "Completion Cost Deficiency," in turn, included construction costs going above and beyond the budget for hard and soft costs listed in the Original Loan Agreement (set at $37.92 million).[1] (*Id.* at PageID 8627; R. 152-2, Original Loan Agreement, PageID 10740.)

---

[1] More specifically, the Completion Guaranty defines "Completion Cost Deficiency" as follows: "[A]s of the date of determination, the amount by which the sum of (i) all remaining unpaid and projected Hard Costs and Soft Costs in accordance with the Construction Budget, the Construction Contract and the Loan Documents and (ii) *all remaining and projected costs to enable the performance and satisfaction of all of the covenants of Borrower contained in the Loan Documents through the Final Completion with respect to Hard Costs and Soft Costs*, as of such date, exceeds (A) all undisbursed Loan funds allocated to payment of Hard Costs or Soft Costs, (B) all sums in the Construction Reserve allocated to payment of Hard Costs or Soft Costs, and (C) all sums in

With these documents papered and inked, construction began on the project. But it wasn't long before things began to unravel. Soon enough, the parties found themselves embroiled in a series of legal disputes, three of which are relevant here.

*Receivership and foreclosure*. In 2016, Packard Square defaulted by missing the construction milestones specified in the Original Loan Documents. And so Can IV filed suit in the Washtenaw County Circuit Court, seeking foreclosure and the appointment of a receiver. That court appointed a receiver to take over the property, borrow funds as needed, and complete the construction. Packard Square appealed, but the Michigan Court of Appeals affirmed. *Can IV Packard Square LLC v. Packard Square LLC*, No. 335512, 2018 WL 521843, at \*5, \*9 (Mich. Ct. App. Jan. 23, 2018) (per curiam). Soon after that, the Michigan Supreme Court denied leave to appeal. *Can IV Packard Square LLC v. Packard Square LLC*, 917 N.W.2d 624 (Mich. 2018) (mem.).

By this point, it was becoming apparent that the project would end up overbudget. And so the newly-appointed Receiver secured an additional $37.46 million in loans from Can IV (the "Receiver Loan") to finance and complete the remaining construction. This Receiver Loan was secured by a super-priority mortgage on the same property.

The litigation continued apace in the meantime. Can IV eventually moved for summary disposition on its foreclosure claim. More specifically, it sought foreclosure on both mortgages (on the Original Loan and the Receiver Loan, respectively). *See Can IV Packard Square, LLC v. Schubiner*, No. 352510, 2021 WL 1711593, at \*2 (Mich. Ct. App. Apr. 29, 2021) (per curiam). The Washtenaw County Circuit Court granted summary disposition and "entered a judgment of

---

the Construction Disbursement Account allocated to payment of Hard Costs or Soft Costs." (R. 130-3, Completion Guar., PageID 8627 (emphasis added).)

foreclosure authorizing the sale of the property at a sheriff's sale." *Id*. (internal quotation omitted). A sheriff's sale took place in November 2018, and Can IV purchased the property with a $75 million credit bid. *Id.* Can IV applied the proceeds first to the higher priority Receiver Loan and the leftover amount to the Original Loan. *Id.* at *11. This left Can IV about $14 million short, which included the remaining indebtedness on the Original Loan and $1.6 million for the remaining construction costs. *Id.* Not long after, the Michigan Court of Appeals affirmed the trial court's order. *Id.* at *1. The Michigan Supreme Court eventually denied leave to appeal. *Can IV Packard Square LLC v. Packard Square LLC*, 939 N.W.2d 686, 686-87 (Mich. 2020) (mem.).

*Recourse Guaranty.* A second action paralleled much of the receivership litigation. In September 2017, Packard Square filed for Chapter 11 bankruptcy. *Can IV*, 2021 WL 1711593, at *1. The bankruptcy triggered, in turn, Can IV's right to enforce the Recourse Guaranty. *Id.* at *2. And so in 2018, Can IV sued Schubiner in the Oakland County Circuit Court for repayment of the Original Loan. *Id.* In December 2019, the court granted summary disposition in Can IV's favor and held Schubiner liable for the outstanding $14 million. *Id.* at *3. Schubiner appealed, but the Michigan Court of Appeals affirmed. *Id.* at *17. About a year later, the Michigan Supreme Court denied Schubiner's application for leave of appeal. *Can IV Packard Square, LLC v. Schubiner*, 970 N.W.2d 324 (Mich. 2022) (mem.).

*Completion Guaranty*. That brings us to the third and final lawsuit, which is the immediate dispute presented on appeal. With the Receiver at the helm, construction finally finished in February 2019. Two months later, Can IV decided to enforce the Completion Guaranty and sent Schubiner a demand letter for payment of a $20.09 million "Completion Cost Deficiency." (R. 1, Apr. 25, 2019 Demand Letter, PageID 240-42.) Can IV arrived at this number by subtracting the Original Loan Agreement's budget ($37.92 million) from the total hard and soft costs expended in

4

completing construction ($58.01 million). When Schubiner refused to pay, Can IV filed suit in the Washtenaw County Circuit Court. Schubiner removed the case to the Eastern District of Michigan on diversity.

Eventually, Can IV and Schubiner filed dueling summary judgment motions. Can IV claimed "the clear and unambiguous terms of [the] Completion Guaranty" entitled it to $20.09 million in damages. (R. 129, Can IV Mot., PageID 7761.) Schubiner's motion, meanwhile, focused on res judicata. Responding to Can IV's motion, Schubiner argued that Can IV could not establish any damages under the Completion Guaranty because it was "fully repaid for the Receiver's construction costs and more." (R. 152, Schubiner Resp., PageID 10635.) More specifically, the $20.09 million "Completion Cost Deficiency" was financed with the Receiver Loan, and Can IV had already recouped the full sum of that loan by applying the foreclosure proceeds.

The district court was unpersuaded. In August 2021, it granted Can IV's motion and denied Schubiner's. Citing no cases, the court explained that Can IV had a viable claim for damages because it "does not seek to hold defendant accountable for [the Receiver] loan, but to hold him to the terms of his guaranty to pay the completion cost deficiency." (R. 159, Aug. 16, 2021 Op. & Order, PageID 13081.) The district court went on to award Can IV $20.09 million plus 16 percent interest. And now Schubiner appeals.

## II.

"We review a district court's grant of summary judgment de novo, viewing all the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in his favor." *Delek US Holdings, Inc. v. United States*, 32 F.4th 495, 497 (6th Cir. 2022) (internal quotations omitted).

III.

Under Michigan law, parties claiming breach of contract must establish that "(1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014). And here, "[t]his appeal concerns only the damages component of Can IV's claim (element (3))." [2] (Appellant Br. at 20.) Schubiner argues that Can IV's claim fails because the damages here amount to impermissible double recovery. And he challenges the 16 percent interest rate as well. Because Schubiner prevails on the double-recovery question, we need not reach the second issue.

"Michigan law proscribes double recovery for the same injury." *Chicilo v. Marshall*, 460 N.W.2d 231, 232 (Mich. Ct. App. 1990) (per curiam). And "[t]o ascertain whether a double recovery has occurred, we must determine what injury is sought to be compensated." *Id.* Importantly, "[i]n making such a determination, . . . the label attached to the plaintiff's claims are of little relevance." *Id.*; *see also Ledbetter v. Brown City Sav. Bank*, 368 N.W.2d 257, 262 (Mich. Ct. App. 1985) (per curiam) ("At issue is whether there was a double recovery for the same injury, not the label attached."). What matters instead is whether "a recovery is obtained for any injury identical with another in nature, time, and place." *Grace v. Grace*, 655 N.W.2d 595, 602 (Mich. Ct. App. 2002).

Thus, the case boils down to this: Has Can IV already recovered for an identical injury? The facts make clear that it has. The injury here comes in the form of cost overruns not covered by the Original Loan—more specifically, the hard and soft costs of construction above and beyond

---

[2] More specifically, "[Schubiner] appears to concede, as he must, that [Can IV] has established the first two elements of its claim, i.e., that 'there was a contract' (the completion guaranty) and that he breached it (by not completing the project when [Packard Square] failed to do so)." (R. 159, Aug. 16, 2021 Op. & Order, PageID 13079.)

the Original Loan Agreement's budget. The point of the Completion Guaranty is to ensure that Can IV isn't left footing the bill for these overruns. But Can IV financed most of these extra costs with the Receiver Loan, and it has since recouped the full value of that loan by applying the proceeds of the sheriff's sale. Additionally, $1.6 million of the $14 million judgment covered the remaining construction costs to complete the project, post-foreclosure. That means there is no longer any injury that the Completion Guaranty can redress. To say otherwise means Can IV gets to profit off Schubiner's breach. *See Parmet Homes, Inc. v. Republic Ins. Co.*, 314 N.W.2d 453, 458 (Mich. Ct. App. 1981) (per curiam) ("The injured party is not entitled to be placed in a better position than he would have been had the contract not been broken."). Affirming here would allow Can IV to collect a $20.09 million windfall just because it secured its investment in redundant ways.

In assessing the double-recovery issue, the district court emphasized that the Receiver Mortgage and the Completion Guaranty are technically separate contracts. And so, in the district court's view, the obligations that arise under each must be separate and distinct. (*See* R. 159, Aug. 16, 2021 Op. & Order, PageID 13081 ("Plaintiff does not seek to hold defendant accountable for [the Receiver] loan, but to hold him to the terms of his guaranty to pay the completion cost deficiency.").) But the court didn't cite any cases for the proposition that if damages arise under a separate contract, *that fact alone* precludes double recovery—even if the underlying injury is identical.

In fact, the cases say the opposite. Even when damages arise under a separate contract, the analysis circles back to the same inquiry: Does the injury overlap? *See Orley Enters., Inc. v. Tri-Pointe, Inc.*, 522 N.W.2d 896, 899 (Mich. Ct. App. 1994) (plaintiff barred from recovering under both a purchase agreement and a promissory note because doing so "could result in double redress

7

for a single injury"); *Robinson v. Fritz Builders, Inc.*, No. 275033, 2008 WL 239574, at *2 (Mich Ct. App. Jan. 29, 2008) (per curiam) (plaintiffs limited to their breach of contract claim since "[t]he breach of contract, fraud, and [statutory] claims all sought recovery for the same injury"); *Compass Grp. USA, Inc. v. Eaton Rapids Pub. Schs.*, 349 F. App'x 33, 37 (6th Cir. 2009) (applying Michigan law and holding that "[the defendant] must demonstrate that the two breaches [of two separate contracts] caused a 'single injury'" (quoting *Great N. Packaging, Inc. v. Gen. Tire & Rubber Co.*, 399 N.W.2d 408, 410 (Mich. Ct. App. 1986))).[3]

After all, double recovery is off the table when, for example, the "sole injury is coextensive under [the plaintiff's] contract and tort claims." *Trost v. Trost*, 525 F. App'x 335, 346 (6th Cir. 2013) (Michigan law); *see also Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 43 F.3d 1054, 1063-64 (6th Cir. 1995) (applying Michigan law and barring plaintiffs from recovering under both tort and contract for identical injury). Nor can a policyholder pyramid redundant recoveries by stacking multiple insurance policies over the same harm. *See, e.g.*, *Beaver v. Auto-Owners Ins. Co.*, 286 N.W.2d 884, 885 (Mich. Ct. App. 1979) (no recovery because plaintiff was "not seeking to collect under a separate private policy with extra coverage" but was instead "attempting to collect double under two no-fault insurance policies"); *Miclea v. Cherokee Ins. Co.*, 963 N.W.2d 665, 668 (Mich. Ct. App. 2020) ("[P]ersons are generally not entitled to a double recovery from multiple policies unless the person's injuries exceed policy limits.").

Surely, this logic applies equally when, as here, a contract comes paired with collateral and a lender has a second mechanism to recover the same single loss. *See, e.g.*, *Dorrill v. Eaton*, 35

---

[3] Can IV cites *Compass Group* to support its position, evidently because we ultimately concluded in that case that there was no double recovery. But our reasoning there turned on the fact that the two contracts covered different injuries. *Compass Grp.*, 349 F. App'x at 37. Thus, the case hurts rather than helps Can IV's position.

Mich. 302, 303-04 (Mich. 1877) (holding that a creditor must offset the judgment on his note with the proceeds from selling the collateral); *Comerica Bank v. Cohen*, 805 N.W.2d 544, 550 (Mich. Ct. App. 2010) (plaintiffs can proceed against the collateral and seek to enforce a guaranty at the same time, but only "*so long as plaintiff is not awarded double recovery*" (quoting *Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451, 461 (Mich. Ct. App. 1989))); *Comerica Bank v. Pars Ice Cream Co., Inc.*, No. 338955, 2018 WL 6625171, at *10 (Mich. Ct. App. Dec. 18, 2018) ("[O]nce [plaintiff] collects and satisfies, in full, the amount of its claim, from either [the mortgage or the guaranty], it would have no right to collect further."). And, here, Can IV had two means to recoup the construction cost overruns: applying its credit bid to the Receiver Loan and securing a judgment for the remaining construction costs, and enforcing the Completion Guaranty.[4]

Can IV bootstraps one final argument in a bid to save its award: Since Can IV has yet to collect on the $14 million judgment from the Recourse Guaranty litigation, it should get to keep its $20.09 million Completion Guaranty award. But this argument fails because a party can't avoid a double recovery by simply waiting to collect on a prior judgment until it obtains the duplicative judgment. The focus is on awards, not collection. *See, e.g.*, *Chicilo*, 460 N.W.2d at 232 (holding that because "the damage *awards* received in both the federal court action and the state court action compensate the same injuries," "plaintiff has recovered twice for the same injuries" (emphasis added)). Indeed, at argument, Can IV was unable to state how collection on the two judgments—the state-court judgment and the judgment below—would differ.

---

[4] At argument, Can IV also conceded that if the amount allocated to the Receiver Loan in the foreclosure action—$37 million—offsets the amount attributable to construction-completion costs expended by the receiver under the Completion Guaranty's formula, no cost overruns remain uncovered and Can IV has been compensated for its loss. (Oral Arg. at 28:09-29:08.)

But more fundamentally, this argument is problematic because the Completion Guaranty award and the Recourse Guaranty award broadly cover different injuries. Specifically, the Recourse Guaranty award principally covers Can IV's entitlement to the Original Loan amount (the $1.6 million extra for additional construction costs notwithstanding). Meanwhile, the $20.09 million Completion Guaranty award goes entirely toward cost overruns in excess of the original budget. That is to say, Can IV can't simply mix and match recoveries and injuries by insisting on using the Completion Guaranty award to collect on all $14 million of the Recourse Guaranty award, most of which has nothing to do with cost overruns. Put another way, Can IV doesn't get to keep its $20.09 million windfall just because it happens to have some other, unrelated use for it. To hold otherwise would create an elephant-sized loophole in double-recovery doctrine.

In the end, the decision below places Can IV "in a better position than [it] would have been had the contract not been broken." *Parmet Homes*, 314 N.W.2d at 458. Can IV is unable to establish any damages, which means its breach of contract claim has no leg to stand on.

## IV.

For these reasons, we vacate, reverse, and remand with instructions to enter summary judgment in Schubiner's favor.